970 So.2d 229 (2007)
Donald Keith BURTON a/k/a Donald Wayne Burton, Appellant
v.
STATE of Mississippi, Appellee.
No. 2005-KA-01735-COA.
Court of Appeals of Mississippi.
December 4, 2007.
*230 Aafram Yaphet Sellers, attorney for appellant.
Office of the Attorney General by Deirdre McCrory, attorney for appellee.
Before KING, C.J., IRVING, CHANDLER, and CARLTON, JJ.
IRVING, J., for the Court.
¶ 1. After a jury trial, Donald Keith Burton was found guilty of kidnapping, *231 rape, and armed robbery and was sentenced by the Hinds County Circuit Court to serve twenty-five years, with five years suspended and five years of supervised probation, on each count. The three sentences are to run consecutively to one another, for a total of sixty years. Aggrieved, Burton appeals and alleges: (1) that he was denied his constitutional right to a speedy trial, (2) that the court erred in admitting the victim's auditory identification of him, (3) that he received ineffective assistance of counsel, (4) that the evidence is insufficient to sustain his conviction, and (5) that his conviction is against the overwhelming weight of the evidence.
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. On the night of September 12, 2000, V.M.[1] went to the Lefleur Station post office in Jackson, Mississippi, to check her mail. As she exited the post office, a man with a towel wrapped around his head came up behind her, placed a gun to her back, and told her that he needed money. V.M. gave the individual, later identified as Burton, her wallet. Burton looked through the wallet and indicated to V.M. that the wallet did not contain enough money. Burton then instructed V.M. to get into the passenger seat of her car. Burton drove himself and V.M. to a nearby ATM, where she withdrew $150 and gave it to Burton. Burton then drove V.M. to a nearby parking lot, where he pointed a gun at her and told her to take her pants off. Burton first attempted to force V.M. to perform oral sex on him at the back of the car. When that proved unsuccessful, he threw her onto the trunk of her car and vaginally raped her. After the assault, Burton drove V.M. back to the post office, where he wiped down the steering wheel before getting into another vehicle and driving away.
¶ 4. After Burton left, V.M. retrieved her cellular telephone, dialed 911, and followed Burton long enough to get a partial license plate number. While on the phone with 911, V.M. stated that she had been raped by a black male, approximately 5'11" or 6'0" tall, with a skinny build. V.M. told officers that the individual who had raped her had talked continuously throughout the kidnapping and assault, had told her that he knew where she lived, and that he would kill everyone in the house if she went to the police. V.M. also gave law enforcement what she believed to be the license plate number and informed officers that the perpetrator had been in her car and had touched things. The car was subsequently dusted for prints. V.M. was taken to the hospital for a rape examination.
¶ 5. The vehicle that V.M. described Burton getting into was found burned a few days after the assault. The owner of the vehicle had reported on September 11, one day before the incident in question, that the vehicle was stolen by a tall, thin, black male. Several months after the assault, fingerprints taken at the crime scene were identified by Terry Amburgey, a fingerprint specialist with the FBI, as belonging to Burton. DNA testing of vaginal swabs from the rape examination and of a hair found on V.M.'s clothing could not exclude Burton as the perpetrator.[2] On *232 May 2, 2001, Burton was in federal court on charges related to V.M.'s assault. V.M. had been notified of the appearance and was present in the courtroom. V.M. testified that an officer stood in front of her so that she did not have to see Burton, but after listening to him speak for a minute or two, V.M. was certain that Burton was the man who had raped her. V.M. testified that there was no doubt in her mind that Burton was the man who had robbed, kidnapped, and raped her.
¶ 6. At trial, V.M. described her ordeal and her subsequent identification of Burton. Experts testified regarding the forensic evidence, such as DNA and fingerprints, that had been recovered from the scene. Law enforcement officers testified about their investigation. Burton did not take the stand, but Mia Deon Robinson, who has had three children by Burton, testified that Burton was with her part of the day of September 12, 2000. Robinson testified that, at that time, Burton lived with his sister, Keisha, and that around the time of the assault he would have been with his sister. In response to Robinson's testimony, the State called Special Agent Norman Comeaux, who testified that Burton told officers after he was arrested that he had been in Colorado the entire month of September. At the end of the trial, the court granted Burton a directed verdict on a fourth charge of sexual battery. The jury found Burton guilty of robbery, kidnapping, and rape, and the court thereafter sentenced him to serve a total of sixty years.
¶ 7. Additional facts, as necessary, will be related during our analysis and discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES
1. Speedy Trial
¶ 8. In his first assertion of error, Burton claims that he was denied his constitutional right to a speedy trial. Burton does not claim that his statutory right to a speedy trial was violated; therefore, we address only his constitutional right.
¶ 9. In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court announced the test for determining whether a constitutional violation of a defendant's right to a speedy trial has occurred. This test has subsequently been adopted by Mississippi courts. According to the test, there are four factors that a court must look at to determine whether a violation has occurred: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) the prejudice suffered by the defendant as a result of the delay. Poole v. State, 826 So.2d 1222, 1228-29(¶ 18) (Miss.2002) (citing Barker, 407 U.S. at 530, 92 S.Ct. 2182). We address each of the four factors in turn below.
Length of Delay
¶ 10. In this case, more than eight months elapsed between Burton's arrest and his trial. Therefore, the length of the delay is presumptively prejudicial and we must address the remaining Barker factors. Id. at 1229(¶ 19).
Reason for the Delay
¶ 11. Burton was first arrested by federal authorities on May 2, 2001, and was indicted on federal charges related to the incident at issue here on May 22, 2001. *233 On June 12, 2001, Burton was indicted in Mississippi state court. The federal trial and a resulting appeal then proceeded. On March 12, 2003, Burton's federal conviction was overturned. On July 28, 2003, the State of Mississippi took Burton into custody to stand trial on his state charges, and Burton was arraigned in state court less than two months later. On October 2, 2003, Burton's attorney requested a continuance to prepare further for trial. On December 8, 2003, the case was continued because of the court's docket. On January 26, 2004, the State requested a continuance due to the unavailability of several witnesses. In the meantime, on March 1, 2004, Burton was retried and convicted on the federal charges. Then, on March 29, 2004, Burton stood trial in state court and was also convicted.
¶ 12. Delays that are not caused by a defendant or that are without good cause count against the State in weighing this factor. Flora v. State, 925 So.2d 797, 823(¶ 90) (Miss.2006) (citing Hersick v. State, 904 So.2d 116, 121(¶ 7) (Miss.2004)). Here, the first delay, from June 2001 until July 2003, was caused by Burton's federal prosecution. Therefore, this delay was for good cause and should not weigh against the State. The next delay was caused by Burton's attorney's request for a continuance in October 2003, and is not attributable to the State. The next delay was a result of the court's docket and was therefore with good cause, as was the last delay in January 2004, when the State's witnesses were unavailable for trial. Therefore, although almost three years elapsed before Burton's trial, we find that this factor does not weigh strongly in favor of either Burton or the State.
Request for a Speedy Trial
¶ 13. On March 15, 2004, and again on March 25, with trial set for March 29, 2004, Burton made a request for dismissal for failure to grant a speedy trial.
¶ 14. As Burton concedes, this factor weighs against him, as he never demanded a speedy trial. The Mississippi Supreme Court has made a distinction between motions to dismiss for want of speedy prosecution and motions to demand a speedy trial:
In Adams [v. State, 583 So.2d 165, 170 (Miss.1991),] we observed that a demand for dismissal for violation of the right to speedy trial is not the equivalent of a demand for speedy trial. Such a motion seeks discharge not trial. There we held that a demand for dismissal coupled with a demand for an instant trial was insufficient to weigh this factor in favor of the defendant, where the motion came after the bulk of the entire period of delay had elapsed. Id. Similarly, as the trial court observed, Perry never demanded trial; he demanded dismissal claiming that his speedy trial rights had already been violated. Although his June motion mentioned that trial was set for October, an earlier trial date was not a part of the relief requested, even in the alternative.
Perry v. State, 637 So.2d 871, 875-76 (Miss.1994); see also Stark v. State, 911 So.2d 447, 452 (¶¶ 26-27) (Miss.2005); Gray v. State, 728 So.2d 36, 48 (¶¶ 35-36) (Miss.1998). Since Burton never demanded a speedy trial, this factor weighs against him.
Prejudice
¶ 15. The final factor that must be addressed is whether Burton has suffered any prejudice as a result of the delay in bringing him to trial. There are three interests that must be addressed in looking at this factor: the prevention of "oppressive pretrial incarceration," the minimization of "anxiety and concern of the *234 accused," and the limitation of impairment of the accused's defense. Jenkins v. State, 947 So.2d 270, 277(¶ 21) (Miss.2006) (quoting Mitchell v. State, 792 So.2d 192, 212(¶ 77) (Miss.2001)). "Generally, proof of prejudice entails the loss of evidence, the death of witnesses, or the staleness of an investigation." Id. (citing Sharp v. State, 786 So.2d 372, 381(¶ 19) (Miss.2001)).
¶ 16. Burton alleges that he has suffered actual prejudice:
The Appellant's ability to defend himself was impaired greatly by the delay in this matter. First, due to the Appellant's confinement while awaiting trial he was unable to adequately assist his counsel in preparing for trial. Specifically, due to his prolonged confinement, the Appellant was unable to help his counsel locate witnesses to testify on his behalf at trial. Thus, Keisha Burton, was not available at trial to testify on the Appellant's behalf. Furthermore, because of the delay in this matter one of the Appellant's witnesses, Terry Rushing, was not able to recall the date in question or events surrounding this case, and was thus, unable to provide relevant or pertinent information regarding the Appellant's whereabouts on the date in question.
However, at the pretrial hearing on Burton's motion to dismiss for want of speedy prosecution, Burton did not allege any prejudice regarding an inability to locate witnesses, or an inability on the part of witnesses to recall pertinent facts. In fact, Burton's attorney told the court: "We do not allege any deceased witnesses, prejudice of that nature. We do allege prejudice of the time in jail and the time in general."
¶ 17. As to the absence of testimony by Terry Rushing, the second witness listed above, at the beginning of Burton's case-in-chief, Rushing was brought into the courtroom outside the presence of the jury and was questioned by the court and Burton's attorney. Apparently, Burton thought that Rushing would be able to provide an alibi for him. Instead, Rushing testified that he could not vouch for Burton's whereabouts during the relevant time period. When questioned regarding why he would not be able to provide an alibi, Rushing testified:
[RUSHING]: I don't know if he'll be doing  I mean, I don't know if he be doing, people don't know what I'm doing, we all adults. Like, for example, you might say, I'm a go home [sic].
[THE COURT]: Yes, sir.
[RUSHING]: Well, then you might stop at your sister [sic] house or the store or might visit your mother at that period of time while you say you going home. And I'm thinking you might say you're going home but at the same time you might do other things. You don't never know what a person does or you don't know if people who you hang with does [sic].
In other words, Rushing was unable to provide Burton with an alibi because he could not vouch for what Burton might have done while he said he was doing something else. Rushing did not testify that he was unable to provide Burton with an alibi because so much time had passed that he could no longer remember what had happened.
¶ 18. The absence of Keisha Burton, the other witness mentioned by Burton in his appeal, was also discussed at the beginning of Burton's case-in-chief. In fact, the court had granted Burton a continuance in the middle of trial, before beginning his case-in-chief, to allow Burton to contact his sister Keisha. Although Burton alleges that Keisha could not be located and that he would have been able to help find her *235 had he not been incarcerated, the record belies this allegation, as Burton's attorney told the court: "Keisha Burton right now has not shown up even though she said she would last night." Keisha was not available to testify for Burton because she chose not to come to court, even though Burton's attorney had spoken to her the night before, and even though she had agreed to testify on Burton's behalf.
¶ 19. Therefore, we find that the record belies Burton's allegations of prejudice to his case. Even though the length of time in this case created a presumption of prejudice, such a presumption is not sufficient to weigh in favor of Burton in light of his inability to show any actual prejudice. Price v. State, 898 So.2d 641, 649-50(¶ 18) (Miss.2005). This factor also weighs against Burton.
¶ 20. After having reviewed all of the Barker factors, we find that Burton was not denied his constitutional right to a speedy trial. Most of the delays in this case were for good cause or were caused by Burton, Burton never demanded his right to a speedy trial, and Burton has been unable to show any actual prejudice to his case. Therefore, this contention of error is without merit.
2. Admission of Voice Identification
¶ 21. Burton alleges that V.M.'s identification of his voice was "the result of a tainted and impermissibly suggestive in-court confrontation orchestrated by the [S]tate."
¶ 22. In Isom v. State, 928 So.2d 840, 847(¶ 22) (Miss.2006), the Mississippi Supreme Court discussed the standard of review that applies to a court's decision to allow a pretrial identification:
The standard of review for trial court decisions regarding pretrial identification is "whether or not substantial credible evidence supports the trial court's findings that, considering the totality of the circumstances, in-court identification testimony was not impermissibly tainted." Ellis v. State, 667 So.2d 599, 605 (Miss.1995) (citing Magee v. State, 542 So.2d 228, 231 (Miss.1989); Nicholson v. State, 523 So.2d 68, 71 (Miss.1988); Ray v. State, 503 So.2d 222, 224 (Miss.1986)). We will only disturb the order of the trial court "where there is an absence of substantial credible evidence supporting it." Id. (citing Ray, 503 So.2d at 224).
(quoting Roche v. State, 913 So.2d 306, 310(¶ 11) (Miss.2005)).
¶ 23. We note at the outset that the pretrial identification by V.M., whether intended or not, was unjustifiably suggestive. V.M. had been told that her attacker, Burton, would be appearing in court, and she then went to court to observe Burton. However, finding that the identification was suggestive does not end our analysis, as we must determine whether the identification was reliable enough to render it admissible, even with the suggestiveness of the encounter. Outerbridge v. State, 947 So.2d 279, 282(¶ 9) (Miss.2006). The Outerbridge court explained:
The holding of Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), which has long guided this Court's decisions on eyewitness identifications, established the central question as being "whether under the `totality of the circumstances' the identification was reliable even through the confrontation was suggestive." It held, inter alia, that five "factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of *236 time between the crime and the confrontation." Id. at 199, 93 S.Ct. 375.
Id. We address each of the Biggers factors below.
Opportunity of the Witness to Observe the Defendant
¶ 24. Although V.M. had little opportunity to observe her attacker's appearance, as he covered his face and head with a towel, she had ample opportunity to observe his voice and speech. In fact, V.M. indicated that her attacker spoke almost continuously throughout the incident, which she estimated lasted around forty-five minutes. V.M. testified that she told officers after the assault that "I could identify him as far as how tall he was and all of that but not the face and I knew his voice because he talked to me the whole time. I told him if I ever heard it I would know it." Clearly, V.M. had ample opportunity to observe her attacker's voice and speech.
Witness's Degree of Attention
¶ 25. There is no indication that V.M. had anything other than her assailant on which to focus her attention during the assault. In fact, V.M. testified that she was afraid that her attacker would kill her: "I kept asking him, please, don't kill me, please don't kill me." V.M. testified that there were several times throughout the ordeal when she was threatened with a gun when she did something her assailant disliked. For example: "I could tell he was making a motion and every time I'd look at him he'd put the gun back in my face and say look that way." V.M. testified that once when she refused a command, she was threatened until she agreed: "[he] asked me if I would do anything he asked me to do, and the first time I said no. The second time  he asked me again, he put the gun to me and said will you do anything I ask you to do and I said yes. And he told me to take my pants off and I didn't do it at first. Then he had the gun to my head, he was driving and had the gun to my head." Clearly, V.M. had to pay close attention to her attacker and his demands, or risk being killed. This ensured that V.M. devoted a high degree of attention to her assailant.
Accuracy of Witness's Description
¶ 26. In his arguments to this Court, Burton contends that "[a]lthough, [V.M.] testified that she knew her assailant's voice she never gave a description of the assailant's voice. Furthermore, it does not appear from the record that a description of the assailant's voice was ever solicited from [V.M.]." However, Officer Brian Carver, who interviewed V.M. after the assault, testified: "I asked her to describe the voice and basically what she told me is that it wasn't a low voice." We note that this description is not particularly specific. This Court also does not have any way of comparing the accuracy of this description to Burton's voice, as no samples of Burton speaking were submitted as part of the record. Therefore, we cannot find that this factor particularly weighs for or against the reliability of V.M.'s identification.
Witness's Level of Certainty
¶ 27. This factor weighs in favor of the reliability of V.M.'s identification. She described her identification of Burton's voice: "The judge talked to him and then he started talking, and I told the lady that was with me that that was him. I knew it as soon as I heard his voice that that was him." Shortly after she gave this description to the jury, the prosecutor asked her: "Is there any question in your mind, any doubt in your mind that you recognize the voice of the defendant, Donald Keith Burton?" V.M. responded: "No." V.M. was quite certain that the voice she heard at *237 the pretrial identification belonged to her assailant.
Length of Time
¶ 28. Nearly eight months elapsed between V.M.'s assault and her identification of Burton in court. Eight months is a long period of time over which to recall a voice heard for less than an hour. Therefore, this factor weighs against the reliability of V.M.'s identification.
¶ 29. After reviewing all the Biggers factors, we find that substantial evidence exists to support the court's admission of V.M.'s pretrial identification of Burton. While a relatively lengthy period of time[3] elapsed between the attack and V.M.'s identification of Burton, and while we cannot judge the accuracy of V.M.'s identification, V.M. had ample opportunity to observe Burton's voice, she devoted a high degree of attention to his voice, and she was very certain in her identification of Burton as her assailant. Under these circumstances, we cannot find that the court erred in allowing the admission of the identification.
3. Ineffective Assistance of Counsel
¶ 30. Burton contends that his appointed trial counsel[4] was ineffective for a number of reasons. To prove ineffective assistance of counsel, he "must demonstrate that his counsel's performance was deficient, and that the deficiency prejudiced the defense of the case." Harrell v. State, 947 So.2d 309, 313(¶ 10) (Miss.2007) (quoting Ransom v. State, 919 So.2d 887, 889(¶ 12) (Miss.2005)). Prejudice to the defense of the case occurs when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Ransom, 919 So.2d at 890(¶ 12) (quoting Foster v. State, 687 So.2d 1124, 1129-30 (Miss.1996)). The Mississippi Supreme Court has explained that trial counsel is accorded a presumption of competence:
Judicial scrutiny of counsel's performance must be highly deferential. (citation omitted) . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.' Stringer [v. State, 454 So.2d 468] at 477 [1984]; Strickland [v. Washington], 466 U.S. [668] at 689, 104 S.Ct. [2052] at 2065[, 80 L.Ed. 2d 674 (19840)]. In short, defense counsel is presumed competent. Johnson v. State, 476 So.2d 1195, 1204 (Miss.1985); Washington v. State, 620 So.2d 966 (Miss.1993).
Id. at 889-90(¶ 12) (quoting Foster, 687 So.2d at 1129-30). With these standards in mind, we turn to each of the errors contended by Burton.
*238 ¶ 31. First, Burton contends that his counsel "failed to properly investigate his case. Specifically, counsel failed to contact all witnesses with information regarding his whereabouts on the night in question." We find that this contention of ineffective representation is virtually the same as Burton's second and third contentions: that his counsel did not ensure the attendance of witnesses at trial and that his counsel did not call all the witnesses that Burton "believed to be relevant to his defense." We note that the record before us is not ripe to review these contentions. Burton fails to even mention which witnesses his attorney failed to contact, or which witnesses his attorney contacted but failed to call to the stand. Given the record and arguments before us, it is impossible to determine whether there is any validity to these claims. Since we are affirming Burton's conviction, we "do so without prejudice to [his] right to raise the ineffective assistance of counsel issue via appropriate post-conviction proceedings." Read v. State, 430 So.2d 832, 841 (Miss. 1983). Therefore, we find no merit to this issue, but we do not prejudice Burton's right to raise these ineffective assistance of counsel claims in a motion for post-conviction relief, where he might be able to provide additional information to ripen the record in this case. See Shumaker v. State, 956 So.2d 1078, 1084 (¶¶ 10-11) (Miss.Ct.App.2007); Terrell v. State, 952 So.2d 998, 1007(¶ 40) (Miss.Ct.App.2006).
¶ 32. Burton also claims that his attorney "should have filed a motion for continuance for lack of opportunity to prepare for trial." As with the first three of Burton's contentions, we find that the record is not complete for review of this claim. The record is completely silent as to how much pretrial preparation Burton's trial attorney engaged in, or how thorough that preparation was. Therefore, we affirm without prejudice to Burton's right to raise this issue in post-conviction proceedings.
¶ 33. Burton further argues that his attorney was ineffective for failing to "formally assert the [his] Constitutional right to a speedy trial." While the lack of a motion asserting Burton's right to a speedy trial has impacted the strength of his appellate claims to a violation of his constitutional right to a speedy trial, we cannot say that the decision not to ask for a speedy trial was deficient under the circumstances. The decision as to whether to file such a motion falls under the ambit of acceptable trial strategy. In the absence of evidence that there was no possible trial strategy behind this decision, we find that this does not rise to the level of ineffective assistance of counsel. Furthermore, since Burton himself alleges that his attorney should have requested more time to prepare for trial, it is unclear to us how Burton could have been prejudiced by his attorney's failure to request an even speedier trial. If, as Burton suggests, his attorney was not prepared for trial, clearly the decision to not request an even earlier trial date would fall within the ambit of sound trial strategy.
¶ 34. Burton next asserts that his counsel was ineffective for failing to suppress the 911 tape that was played for the jury. Burton contends that the transcript of the audiotape that was introduced into evidence was sufficient, and that the audiotape itself had a "prejudicial and inflammatory effect." Burton recognizes that his attorney objected to the introduction of the tapes "but was overruled by the Court." Since Burton must show both a deficiency and a resulting prejudice to succeed on this claim, his assertion that this constitutes ineffective assistance of counsel must fail. Burton does not suggest that his attorney could have made any additional arguments in a motion to suppress that *239 were not raised with the court when Burton's attorney framed his oral objections to the court. The court's overruling of the attorney's objection indicates that any motion to suppress would have been denied on the same grounds. Therefore, even had such a motion been filed, it would have been denied. Burton cannot have suffered prejudice to his case as a result of the non-filing of a motion that would have been denied had it been filed.
¶ 35. As his seventh allegation of attorney error, Burton claims that his attorney was ineffective for failing to require the court to conduct a hearing pursuant to Polk v. State, 612 So.2d 381 (Miss.1992). However, Burton then goes on to acknowledge: "In fact, counsel waived the Appellant's right to a Polk hearing. The Appellant submits that although counsel conferred with him regarding waiving the Polk hearing, counsel did not adequately explain to him the relevance and importance of such hearing during that conversation." There is no evidence in the record to suggest that the significance of such a hearing was not fully explained to Burton. In fact, the importance of the hearing had been explained to him prior to the waiving of the hearing, and an additional conference was held between Burton and his trial counsel during the discussion of the waiver with the court. After conferring with Burton, his counsel again reiterated that they would like to waive his right to a hearing. Specifically, his attorney stated: "Your Honor, I would like to represent to the court that I've conferred with my client and my client agrees with me in waiving the Polk hearing and I make that representation to the court." The waiver of the hearing was clearly a matter of trial strategy, and furthermore was explained to Burton by his counsel. On these facts, we are not prepared to state that the waiver constituted ineffective assistance of counsel.
¶ 36. Burton next contends that his counsel "failed to call a DNA expert to rebut the State's DNA evidence. Although, counsel's Motion for An Independent DNA expert was granted by the court, counsel did not call this witness to testify at trial." No further argument is made suggesting what the expert would have testified to, and nothing appears in the record to indicate the expert's findings. A more than reasonable assumption to be drawn from trial counsel's failure to call the witness is that the expert had nothing to say that would help Burton; i.e., the expert's DNA analysis did not exonerate Burton, and in fact may have helped further implicate him. Calling the witness under such circumstances would have been of no use at best, and might even have been detrimental to Burton's case. Assuming those to be the circumstances, the decision not to call the expert was clearly sound trial strategy. Because the record is silent as to the substance of the expert's findings, we note that we do not prejudice Burton's right to raise this issue during post-conviction proceedings if there is anything in the expert's testimony that could have helped exonerate him. Unless Burton can present some evidence that the expert's testimony was actually helpful to his case, this issue is clearly without merit.
¶ 37. Burton's final contention is that his counsel's "assertion that he was an inadequate mouthpiece . . . was in and of itself an admission by counsel that he was not providing effective counsel for [him]." A review of counsel's statement in context reveals that counsel was only attempting to request from the court that Burton be allowed to address the court directly. For the sake of completeness, we quote liberally from the record:

*240 [DEFENSE ATTORNEY]: Okay, Your Honor. I mean, he's making a specific request that he personally talk to the witness, but I represent to the court that I have talked to the witness.
[THE COURT]: Thank you, counsel. That's all that will talk to them. The witness had all of this time to visit him at the jail any day he wanted to. Are you ready to proceed?
[DEFENSE ATTORNEY]: If I could have a moment, Your Honor.
[THE COURT]: Nobody has restricted his visitors at the jail, right?
[BURTON]: Yes.
[DEFENSE ATTORNEY]: My client says yes, Your Honor.
[THE COURT]: He can tell you what it is he wants to talk to Mr. Rushing about. Counsel, we're about ready to move forward. I'm tired of your client. I asked a question. I asked him if he wanted to tell me what he wanted to talk to Mr. Rushing about. If he cannot tell me what he wants to talk to Mr. Rushing about, then I am assuming that it's improper and as such my ruling is that he cannot. Are you ready to proceed? We're not about to waste another day. I'm getting ready to give this to a jury as soon as your case is rested.
[DEFENSE ATTORNEY]: Your Honor, I understand and appreciate the court's position. I am in an awkward stance with my client telling me different things at different times.
[THE COURT]: As I said, what is it that he wants to talk to Mr. Rushing about?
[DEFENSE ATTORNEY]: Your Honor, I know I'm his mouthpiece but I feel like I'm an inadequate mouthpiece. I would ask that he be allowed permission to address the court.
[THE COURT]: He may. Yes, sir.
[BURTON]:[5] Mr. Knapp [defense counsel] has indicated to me that Mr. Rushing has implied that he was not going to be an alibi witness to me and for that reason I don't know and I was asking him why at the last moment and I wanted to speak with him to insure that if that was true before I allowed my witness to take the stand for my behalf as an alibi witness which he is an alibi witness but now he's telling me he's not.
[THE COURT]: Have a seat. Bring Mr. Rushing in here and when he gets in here put him under oath for me. We're fixing to find out under oath whether Mr. Rushing is going to be your alibi witness, then the court will perceive it as a proffer made by the defendant.
Clearly, in the context of the above discussion, Burton's attorney was not making any admission that was providing anything other than effective assistance of counsel. This contention is also without merit.
4. Sufficiency of the Evidence
¶ 38. In this contention of error, Burton challenges the sufficiency of the evidence supporting his conviction. When reviewing the sufficiency of the evidence supporting a conviction, we review the record in "a light most favorable to the State." Dixon v. State, 953 So.2d 1108, *241 1111(¶ 4) (Miss.2007) (citing Johnson v. State, 904 So.2d 162, 166(¶ 7) (Miss.2005)). "Essentially, all credible evidence supporting a defendant's guilt should be accepted as true, and all favorable inferences drawn from the evidence must be reconciled in the prosecution's favor." Id. (citing Johnson, 904 So.2d at 166(¶ 7)). We will find error only where "the evidence shows `beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed.'" Id. (quoting Carr v. State, 208 So.2d 886, 889 (Miss. 1968)).
¶ 39. Burton claims that the identification of his fingerprints was suspect because "out of [twenty] possible fingerprint matches that the FBI computer system pulled [the analyst] only compared one possible print to the [Burton's] fingerprints. He testified he did not compare matching points from the other [nineteen] possible prints to the original fingerprint card." While Burton's statement is true, it does not affect the sufficiency of the evidence sustaining his conviction. Terry Amburgey, a veteran fingerprint analyst with the FBI, identified Burton's prints and testified extensively during cross-examination about why he did not review the other nineteen fingerprints that were pulled by the FBI computer:
[DEFENSE ATTORNEY]: All right. Now the computer system that you relayed here today, my understanding is that you submit a print to the computer and it will send you out, what, 20 possibilities; is that correct?
[AMBURGEY]: Yes, it will pull us 20 matching candidates. It gives us names and FBI numbers of 20 individuals that we can actually pull those 20 fingerprint cards from. That is correct, sir. It pulls the top 20 candidates by score.
[DEFENSE ATTORNEY]: Okay. Is that what happened in this case, it pulled 20 prints?
[AMBURGEY]: Yes, that is correct.
[DEFENSE ATTORNEY]: Did you check the other 19 prints?
[AMBURGEY]: No. Once I did the initial comparison of the first candidate and it matched the fingerprint card of that individual, no, I did not compare it against the remaining individuals.
[DEFENSE ATTORNEY]: So today here we know a computer picked out another 19 possibilities, but we've got no evidence of how close they were being [sic] Donald Keith Burton or someone else?
[AMBURGEY]: Yes. The computer makes no identification whatsoever. The computer just pulls out the matching points of identity. And it will always pull 20 candidates regardless of whether the person is identified or not. The computer does not have that knowledge. All the computer does is pull candidates. It's up to the individual specialist to put a magnifying glass on the ink fingerprint and the latent fingerprint and make a determination that, yes or no, it's not identification. But the computer will pull the 20, sir.
[DEFENSE ATTORNEY]: Okay. And an individual such as yourself will make the interpretation of which print is the closest print to what you got?
[AMBURGEY]: Yes. We do our comparison. We will compare all the candidate [sic] if it's necessary. Again, I said earlier, we actually do initial comparisons on the screen just like I showed you here. I don't have the fingerprint card. All I have is the imagine [sic] on the screen. So in this particular case when I compared the first image that it pulled up, I made *242 an identification. So that's when I requested the original fingerprint card and then actually did the comparison of the fingerprint card. Now had I not identified that number one candidate, then I would have gone to number two imagine [sic]. If that wouldn't have been identified, I would have gone to number three all the way to 20. If I would have identified number 17, then I would have requested the original fingerprint card. But I do my initial comparison on the screen, and if I make an identification then I request the original card from Clarksburg, West Virginia.
[DEFENSE ATTORNEY]: Okay. But today, we here can compare the first name that came up with the second name that came up as far as contact points or common areas; is that correct?
[AMBURGEY]: Yes, that is correct. It will pull other fingerprints that are common, very similar in location as far as the points of identity and then it's up to the examiner to be sure that all of these four elements meet the criteria to make a positive identification. But, yes, it will pull 19 other candidates that have similarities with the latent print that I encoded. That's correct, sir.
[Defense attorney then puts fingerprint on screen in front of Amburgey].
[DEFENSE ATTORNEY]: And we won't, unless you feel it will help, have to go through the circling process. What I'm putting this before you for is to reconfirm that you've got ten matching points with the latent and the ink print, and you said there were some more; is that correct?
[AMBURGEY]: Yes, that is correct.
[DEFENSE ATTORNEY]: How many matching points did the second one up from the computer have?
[AMBURGEY]: Again, that comparison wasn't conducted by me. Once I made the identification with the number one candidate I made no other comparison because the latent print was identified with that ink print, it was going to be identified with no one else. So I didn't make any other comparisons, sir.
* * * *
[DEFENSE ATTORNEY]: Okay. Now how do we-how do we know it did not have the same number of contact points with the latent print that was put in the computer?
[AMBURGEY]: With the other 19, sir?
[DEFENSE ATTORNEY]: Yes. How do we know that the other 19, especially the second one in priority, wouldn't have the same number of common features?
[AMBURGEY]: Again, there's only actually four points of identify [sic] that we use when we make identifications. You remember the ending of ridge, splitting or dividing ridge, a dark or an island enclosure. With only four points of identify [sic] in the population of what  three or 400 billion people in the world. Everyone in the world, everyone is going to have those same similarities. But what makes them individually unique is the location, type, direction and relationship that I explained to you. Yes, I'm sure those other 19 had a lot of similarities, but on point number three and point number four  I'm sorry, between point number five and point number six, there's actually three dark intervening ridges in between point number five and number six. Those other *243 ones probably had those points of identity located very similar in the area but they would not have been those three intervening ridges. The unit relationship would not have been the same. It would have been a lot of similarities. But the actual overall unit relationship would have definitely been different. Those other 19 would not have matched this latent fingerprint.
Amburgey also testified that his conclusion as to the identity of the latent print was verified by another specialist at the FBI before it was submitted as a positive identification.
¶ 40. When explaining how close a match Burton's fingerprints were to one of the latent fingerprints lifted from V.M.'s car, Amburgey testified that he specifically charted ten points of comparison, but that many more existed: "There's probably 18 to 20 matching points of identity on this latent fingerprint that matched the inked fingerprint. . . . I was able to positively determine that the inked fingerprint and the latent fingerprint was [sic] positively made by one in the same finger." Amburgey also used photographic enlargements of the prints to explain four of the identity matches in detail.
¶ 41. Clearly, Amburgey explained that Burton's prints were positively identified, meaning that the latent fingerprints taken from V.M.'s car could only have come from Burton. Amburgey explained that looking at the other nineteen fingerprints pulled by the FBI computer would have been futile, as none of them would have matched the fingerprints taken from V.M.'s car. Any questions created by Amburgey's decision not to look at the other nineteen possible matches were placed before the jury as a result of the defense's thorough cross-examination of Amburgey. The decision not to look at the other nineteen fingerprints after a positive identification had been made does not render the evidence in this case insufficient.
¶ 42. Burton also points out that none of the State's experts were able to conclusively identify Burton as the contributor of DNA samples taken from V.M. and her clothing. While this is true, the experts were also unable to exclude Burton as the contributor of many of the samples. Clearly, the meaning of this evidence was for the jury to determine as fact-finder. Burton does not explain how the non-exclusion of him as a contributor makes the evidence against him insufficient.
¶ 43. Burton finally states that V.M.'s voice identification of him was unreliable and should not have been admitted into evidence, and therefore cannot go toward the sufficiency of the evidence sustaining his conviction. As we have already found, although the identification was suggestive, the reliability of the identification indicates that it was properly admitted and considered by the jury.
¶ 44. Burton concludes with a bold statement: "Accepting the State's entire case-in-chief as true, there is no evidence to warrant a conviction of rape, armed robbery or kidnapping." Respectfully, we must disagree. First, V.M. described how her assailant placed his hands on the spoiler of her car as he raped her, and how he failed to wipe away those prints after the assault. Criminal technicians were then able to extract multiple prints from the back of V.M.'s car. While most of these prints were found to belong to V.M. herself, three of the fingerprints could not be identified as hers and were sent to the FBI for identification. Amburgey, a veteran fingerprint analyst, then identified those prints as belonging to Burton, a conclusion that was verified by a second fingerprint analyst at the FBI. It was, in fact, on the basis of this finding that Burton *244 became a suspect in the case. Second, DNA taken from V.M. and her clothing, while unable to be conclusively matched to Burton, also could not exclude him as a suspect. Finally, V.M. testified that she listened to her attacker talk nearly continuously for approximately forty-five minutes as she was threatened at gun point, robbed, kidnapped, and finally raped. V.M. testified that she was certain at the time that she would recognize the voice if she heard it again. Eight months after the assault, V.M. identified Burton's voice as belonging to her assailant. She testified that she was absolutely certain that Burton was the man who attacked her. Clearly, all of this evidence combined is more than sufficient to prove each of the elements of robbery, kidnapping, and rape. Burton's contentions to the contrary are wholly without merit.
5. Weight of the Evidence
¶ 45. When reviewing whether sufficient weight exists to sustain a conviction, "we will disturb a verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." Ross v. State, 954 So.2d 968, 1016 (¶ 127) (Miss.2007) (citing Bush v. State, 895 So.2d 836, 844(¶ 18) (Miss.2005)). As we conduct our review of the record, we do so "in the light most favorable to the verdict." Id. (citing Bush, 895 So.2d at 844(¶ 18)).
¶ 46. Burton does not point out anything new in support of his argument that his conviction was against the overwhelming weight of the evidence, and merely points us to his arguments regarding the sufficiency of the evidence. As we have found, the evidence was more than sufficient to sustain Burton's conviction. Burton did not testify on his behalf, and the only witness who testified for him did not provide a conclusive alibi. Rather, Robinson testified that Burton was with her part of the day on the day that V.M. was assaulted. Clearly, this evidence does not outweigh the compelling evidence in favor of Burton's guilt. Allowing the verdict to stand does not sanction an unconscionable injustice.
¶ 47. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF KIDNAPPING IN COUNT I AND SENTENCE OF TWENTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS A HABITUAL OFFENDER, WITH TWENTY YEARS TO SERVE, FIVE YEARS SUSPENDED, AND FIVE YEARS OF SUPERVISED PROBATION; OF CONVICTION OF ARMED ROBBERY IN COUNT II AND SENTENCE OF TWENTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS A HABITUAL OFFENDER, WITH TWENTY YEARS TO SERVE, FIVE YEARS SUSPENDED, AND FIVE YEARS OF SUPERVISED PROBATION; AND CONVICTION IN COUNT III OF RAPE AND SENTENCE OF TWENTY-FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AS A HABITUAL OFFENDER, WITH TWENTY YEARS TO SERVE, FIVE YEARS SUSPENDED, AND FIVE YEARS OF SUPERVISED PROBATION; ALL OF SAID SENTENCES TO RUN CONSECUTIVELY TO ONE ANOTHER, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HINDS COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR. ROBERTS, J., SPECIALLY CONCURS *245 WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, GRIFFIS, ISHEE AND CARLTON, JJ.
ROBERTS, J., Specially Concurring.
¶ 48. I concur with the majority's well-reasoned opinion affirming Burton's convictions for kidnapping, forcible rape, and armed robbery. I feel compelled to write separately to address a matter concerning sentencing that continues to come before this Court, yet evades review. I write to express my concerns that the sentences imposed in this case are, in fact, unlawful. Further, I encourage circuit judges to respect their oaths to follow the law and to do so when they impose sentences.
¶ 49. Circuit court judges of this state are bound by their oaths to impose lawful sentences upon convicted felons.[6] The failure to impose a lawful sentence upon such a defendant is one of the listed grounds for a petition for post-conviction collateral relief. Miss.Code Ann. § 99-39-5(a) (Rev. 2007). When a convicted felony defendant has been found, beyond a reasonable doubt, to be a habitual offender pursuant to either Mississippi Code Annotated Section 99-19-81 or Section 99-19-83, legislative act removes much if not all of the circuit court judge's sentencing discretion. As a policy decision, the legislature has determined that certain repeat felony offenders represent serious threats to the public safety and, as such, they must be given the maximum authorized sentence and they are not entitled to suspension of sentence, probation, parole, earned time credit, nor any form of early release. To that extent, the legislature has interjected itself into the sentencing process and removed much, if not all of a sentencing court's discretion.
¶ 50. A brief review of pertinent parts of the record illustrates my point. A Hinds County grand jury returned an indictment against Burton that charged him with kidnapping, armed robbery, rape, and sexual battery. Additionally, the indictment alleged that Burton was a habitual offender pursuant to Mississippi Code Annotated Section 99-19-81. The circuit court dismissed the sexual battery charge based on insufficient evidence, and the other matters went before the jury.
¶ 51. Before the jury deliberated, the circuit court instructed the jurors that, should they find Burton guilty of kidnapping, they could fix the penalty at life imprisonment. The circuit court instructed the jurors similarly incident to the armed robbery charge and the rape charge. The jury found Burton guilty of kidnapping, armed robbery and rape, but the jury chose not to return a sentence of life imprisonment.[7] At that point, the following exchange occurred:

*246 THE COURT: The jury has returned its verdict of guilty on all three counts. Does either side have anything to say to the court before I sentence?
MS. ANDERSON: Your Honor, the defendant has been indicted as an [sic] habitual offender under code section 99-19-81, Mississippi Code, 1972 as amended. The State would tender to the court certified copies which are therefore self-authenticated copies of the prior convictions, one being receiving stolen goods in Cause No. 93-3-238 in the Circuit Court of the First Judicial District of Hinds County. The other being 93-3-237, receiving stolen goods as well in the First Judicial District of Hinds County.
THE COURT: May I see those.
MR. KNAPP: Your Honor, if I can glance at them also.
THE COURT: Yes, sir, you can. You can review them with your client.
The court has been passed the two convictions. They are attested and certified convictions based on the seal and the appropriate signatures for two prior convictions for receiving stolen goods. Additionally, the indictment charges defendant as a habitual criminal. If you will pass these to the court reporter and if you would mark them as a composite exhibit, the next numbered exhibit.
[Exhibit marked and admitted]
THE COURT: Anything further?
MS. ANDERSON: No, Your Honor. I would only ask the finding that these convictions arose out of different transactions.
THE COURT: Yes, sir.
(SENTENCING)
MR. KNAPP: Would the defendant rise and face the court, please.
The jury has found you guilty of three counts: Kidnapping, armed robbery, and rape. The court dismissed the charge on sexual battery. The court is now prepared to sentence you.
I have the victim in the back of the courtroom and I have heard her testimony and the testimony of the other persons in this case and I was not the decider of the facts the jury was and they have determined you to be guilty. And they have been merciful to you, Mr. Burton, much more merciful than you were to [V.M.] They have spared you a life sentence and, therefore, that burden falls on the court.
The court is going to sentence you to 25 years on kidnapping. The court is going to sentence you to 25 years on arm [sic] robbery, the court sentences you to 25 years on the rape. I suspend five years on the kidnapping. You are to serve 20 years. The court sentencing you to 25 on the arm [sic] robbery. I suspend five years. You are to serve 20 years. The court on the rape sentences you to 25 years. I suspend five. You are to serve 20 years.
Those sentences are to run consecutive to each other and upon release you'll be placed on five years supervised probation. That is the sentence of the court. If the bailiffs will take the defendant to the Hinds County Detention Center until such time as he can be transferred to the custody of the Department of corrections.
MS. ANDERSON: Your Honor, if I may ask to the habitual status.
THE COURT: Let the record so indicate that is habitual status. Anything further?
I generally speak with the jury and I'll vacate the courtroom and discuss matters with them before they are released. If nothing further the court is adjourned.
*247 No portion of the trial judge's sentence meets the criteria for sentencing a habitual offender under the circumstances. The circuit court clearly found Burton to be a habitual offender pursuant to Section 99-19-81.
¶ 52. If one convicted of a felony has previously been convicted of two other felonies, arising from separate incidents, and that person had been sentenced to separate terms of at least one year each for those two prior felonies, upon conviction of a subsequent felony, the convicted party must be sentenced to the maximum allowable sentence for that felony. Miss.Code Ann. § 99-19-81 (Rev.2007); Frazier v. State, 907 So.2d 985(¶ 11) (Miss.Ct.App. 2005). To clarify, when a person has been found to be a habitual offender, the sentencing court has no discretion in sentencing. Further, Section 99-19-81 goes on to state that such a sentence "shall not be reduced or suspended nor shall such person be eligible for parole or probation."
¶ 53. Incident to a conviction for kidnapping, "If the jury fails to agree on fixing the penalty at imprisonment for life, the court shall fix the penalty at not less than one (1) year nor more than thirty (30) years in the custody of the Department of Corrections." Miss.Code Ann. § 97-3-53 (Rev.2006). Pursuant to Section 99-19-81, the circuit court was obligated to sentence Burton to the maximum thirty-year sentence. Instead, the circuit court sentenced Burton to twenty-five years, and then improperly suspended five years of Burton's sentence and placed Burton on probation.
¶ 54. Incident to a conviction for armed robbery, one "shall be imprisoned for life in the state penitentiary if the penalty is so fixed by the jury; and in cases where the jury fails to fix the penalty at imprisonment for life in the state penitentiary the court shall fix the penalty at imprisonment in the state penitentiary for any term not less than three (3) years." Miss.Code Ann. § 97-3-79 (Rev.2006). In an armed robbery case, a trial judge may not impose a life sentence without authority from the jury, even if the defendant is sentenced as a habitual offender. Under such circumstances, "the maximum term of imprisonment prescribed for the crime for which the appellant was convicted is that sentence imposed by the trial judge, which must be reasonably less than life." Watkins v. State, 500 So.2d 462, 463 (Miss. 1987) (quoting Friday v. State, 462 So.2d 336, 339 (Miss.1985)).
¶ 55. Burton, a black male, was born on September 16, 1973. He was a thirty-years-old when he was sentenced on April 1, 2004. According to an actuarial table composed by the United States Department of Health and Human Services, a publication that is admissible as a self-authenticating document pursuant to M.R.E. 902, Burton's remaining life expectancy is 41.7 years.[8] Considering Burton's life expectancy, the maximum sentence Burton could have received would have been a sentence approaching or near forty-one years.
¶ 56. "Every person who shall have forcible sexual intercourse with any person . . ., upon conviction, shall be imprisoned for life in the State Penitentiary if the jury by its verdict so prescribes; and in cases where the jury fails to fix the penalty at life imprisonment, the court shall fix the penalty at imprisonment in the State Penitentiary for any term as the court, in its discretion, may determine." Miss.Code Ann. § 97-3-65(4)(a) (Rev.2006).
¶ 57. Accordingly, Mississippi law provides for life imprisonment for those found guilty of forcible rape if the jury finds that *248 sentence appropriate. However, if the jury declines to recommend a life sentence, as with armed robbery, the maximum sentence for rape is a term of "something less than life." See Garner v. State, 864 So.2d 1005, 1008(¶ 9) (Miss.Ct.App.2004) ("When the authority to impose a life sentence lies with the jury alone, the court's discretion is limited to a term of something less than life.") Technically, the circuit court's twenty-five year sentence with five years suspended is "something less than life." As demonstrated above, considering Burton's life expectancy, the maximum possible sentence of something less than life would be approximately forty to forty-one years. Additionally, the circuit court should not have suspended five years of that twenty-five year sentence.
¶ 58. This separate opinion should not be construed as a harsh reprimand of the circuit court judge. That is not my purpose. In fact, considering the range of possibilities involved with the circuit court's discretion in running the sentences concurrently or consecutively, the circuit court's sentence was not overly lenient.[9] The circuit court could have sentenced Burton to the maximum sentences for each conviction and run the sentences concurrently. Under those circumstances, Burton's sentence would have been considerably less than his actual cumulative sentence of sixty years. Alternatively, the circuit court could have sentenced Burton to the maximum sentence for each conviction and run the sentences consecutively. There, Burton's sentence would have approached 110 years-a sentence considerably more harsh than his actual sentence. As such, the circuit court's sentence lies somewhere in the center of the range of possibilities.
¶ 59. In any event, it is very well possible, if not likely, that the practical effect of Burton's sentence is a life sentence. However, as members of the judiciary, we are bound to follow and interpret the law. The Mississippi Legislature has clearly removed discretion from sentencing as to the duration of sentences in the context of habitual offenders. Following these laws is not optional for the judge, and it results in predictable and equitable sentencing for habitual offenders. To that end, I encourage members of the judiciary to be cautious when sentencing habitual offenders. An illegal sentence may result in years of delayed outcomes as matters are further litigated in post-conviction proceedings. For the sake of victims, defendants, their families, and taxpayers who fund the system, judges must be certain that their sentences meet the legislature's requirements.
CHANDLER, GRIFFIS, ISHEE AND CARLTON, JJ., JOIN THIS OPINION.
NOTES
[1] We use initials to protect the privacy of the victim in this case.
[2] Because of the small amount of material that was available for testing, mitochondrial, rather than nuclear, DNA testing was done on one of the hairs. While this allowed the smaller samples to be used, mitochondrial DNA testing is not unique to an individual and can only be used to exclude an individual as the donor of a sample. The hair that Burton could not be excluded as the donor of is found in only .56 percent of the African American population, .17 percent of the Caucasian population, and .39 percent of the Hispanic population. Nuclear DNA testing on one of the swabs could not exclude Burton as the contributor. The frequency for the DNA sequence found on the swab could be found in one out of every 180,000 African Americans, or .00056 percent.
[3] While eight months might not be a long period of time in other contexts, we view this as a lengthy amount of time in this context because a review of other cases applying the Biggers factors reveals that most identifications of this type are made within a period of hours or days. Therefore, we find that, in the context of a suggestive identification, eight months is a long enough period of time to weigh against the admissibility of the identification.
[4] Burton is represented by different counsel on appeal than the counsel who represented him at trial.
[5] The transcript indicates that this statement was made by Michael Knapp, who was part of defense counsel. However, the context and wording of the statement makes it clear that it is actually Burton who is speaking. The court reporter appears to have accidentally attributed the statement to Knapp in the transcript, but we have replaced his name with Burton's.
[6] Pursuant to Article 6, Section 155 of the Mississippi Constitution, before taking office all judges must swear or affirm, among other things, to "discharge and perform all duties incumbent upon [him or her] . . . agreeably to the Constitution of the United States and the Constitution and laws of the State of Mississippi." (emphasis added).
[7] It is understandable that the jury failed to impose a life sentence. The jury had little factual information upon which to base its decision. Likely due to the lack of a request, the circuit court did not follow the bifurcated trial procedure set out in URCCC 10.04(B). That rule was specifically designed to deal with situations in which the jury is authorized to impose a life sentence. Accordingly, the jury was completely unaware that Burton had two prior felony convictions in the Hinds County Circuit Court, a federal bank robbery conviction on March 29, 2004, and outstanding charges in Arapahoe County, Colorado based on allegations of robbery, aggravated motor vehicle theft, prohibited wiretapping, and domestic abuse against his child's mother.
[8] http://www.cdc.gov/nchs/data/nvsr/nvsr54/ nvsr54-14.pdf
[9] Mississippi Code Annotated Section 99-19-21(1) (Rev.2007) specifically authorizes a circuit court judge to run two or more convictions consecutively or concurrently.